302 So.2d 83

**Elizabeth RITCHEY et al.**

v.

**STATE.**

**SC 574.**

Supreme Court of Alabama.

Sept. 26, 1974.

William M. Acker, Jr., Ferris S. Ritchey, Jr., Birmingham, for appellants.

Quinton R. Bowers, Sp. Asst. Atty. Gen., Birmingham, for the State.

**McCALL, Justice.**

The defendant landowners appeal from a circuit court judgment in a condemnation proceeding by the State of Alabama, which awarded them damages for the taking of a parcel of land with a brick building and improvements thereon, all of which were being used in the operation of a grocery store business. The real property so taken, which is located at the southwest corner of First Avenue South and 64th Street in the City of Birmingham, is for public use in the construction and maintenance of a public highway and controlled access highway facility, namely, U. S. Interstate I–20.

The first question that the appellants raise in their brief relates to the propriety of certain remarks that the trial judge made during the course of the examination of one of the appellants' witnesses. The appellants contend that these remarks were lengthy, unnecessary and prejudicial comment on the testimony of the witness in the presence of the jury. They also contend that the cumulative effect of the remarks was to destroy the witness' testimony in the eyes of the jury.

The witness was one of the three citizens whom the probate court had appointed earlier as commissioners to assess the amount of damages and compensation to which the appellant landowners were entitled. During the course of his testimony in the circuit court, after stating that he had been appointed by the probate court to look at the property and that he had examined it, the appellants' attorney asked the witness if he knew how many square feet were in the total piece of property. The

record then shows the following which embraces the subject of the appellants' complaint:

"A Yes, sir. We took the measurements—

"MR. LANDRUM: We object to what—

"THE COURT: I sustain on we. He is not asking you how that panel of three worked. He is asking you what you did.

"Q (BY MR. ACKER:) We are talking about what you did, Mr. Dill.

"A All right, sir. I took the measurements of the property and the building that was being taken, and we—I checked the inside. I checked the building, the repairs, and gave it a—a thorough inspection as far as appraising goes.

\* \* \* \* \* \*

"THE COURT: I assume you are still talking about this same lot there?

"THE WITNESS: Yes, sir. That is the one.

"THE COURT: All right.

"A And we had some comparables that we—

"MR. LANDRUM: We—

"A That I put in—

"THE COURT: You see. Let me explain this to the witness. You may not understand it. We—we are not taking the testimony about what that panel did.

"THE WITNESS: Uh huh.

"THE COURT: But if you came upon some facts yourself—

"THE WITNESS: Yes, sir.

"THE COURT: And acquired some information and have some information and have some personal judgment about it, that is the things we are dealing with as far as you are concerned.

"THE WITNESS: Yes, sir.

\* \* \* \* \* \*

"Q (BY MR. ACKER:) Would you tell the jury, if you recall what the number of square feet in the total piece of property was?

"A I didn't bring those notes. I just brought the—the final figures on—on the lot and on the building that we had—that I had compiled.

"Q All right. Well, what—what figures did you—did you arrive at?

"THE COURT: Well, now, I am going to sustain on that and exclude it and I want to say this: I have said this to the witness two or three times. The law says to you and me that if we are going to try to see what they did down there and do the same thing, then we are just wasting our time. The law says we ourselves shall try this case anew. Anybody got a witness, bring him. We will hear what he has got to say. If you have got any data to give us, give it to us right here. We will look at it, come to our own judgment about it, and that is what we are doing.

"Now, as far as some—some board, what they did, we are not interested in that. If this gentleman was a member of that group, that is all right, but he comes here an individual. What does he himself know? What is his own judgment? What does he say about this, that, and the other? That is the thing we are trying to take, and I don't want us to get mixed up in what we are doing. The law says that is the way we should do it, and that is the way we are going to do it."

After a colloquy about a voir dire examination of the witness by the State's attorney on whether or not certain figures and notes were those of the witness, the court further stated:

"THE COURT: I am familiar with what the question is, gentlemen. Let's don't have any hullabaloo about it. I am trying to do some thinking as I go along.

"MR. ACKER: May I approach the bench?

"THE COURT: I—I think I should caution the witness again. I don't personally know, incidentally, what the three as a group did. That may sound strange, but that is a fact, because that isn't any of my business, and I am not concerned with that. We are trying it anew. Whatever he may know about it or whatever inquiry he made about it being in the real estate business for these years, he may testify about. And then from that, if he himself personally has got a judgment, he may give us that judgment, and you can put it with the other testimony and come to your own judgment in the end about where the truth is.

"Now, I think that ought to make it clear. I don't see why we should be running into any difficulty. If you want to go ahead with your question—

"Q (BY MR. ACKER:) Do you have a judgment as of what the fair market value of Tract No. 173, land and all improvements, including equipment, was as of August 11, 1973—'69?

"A Yes, sir.

"Q What is that opinion?

"A Is $136,700."

Thereafter the following transpired in the course of the direct examination of this witness:

"Q If you would, break it [his valuation] down the way you break it down in your judgment.

"A The land valuation—I mean the building valuation was $83,200.

"THE COURT: Now, you see the way he answers?

"MR. LANDRUM: Yes, sir.

"THE COURT: He says the building valuation was—I—I believe there we are probably doing the very thing that the law says we must not do. I recess the Court until 1:30. You may go to your lunch.

"(Whereupon, the proceedings were in recess from 12:20 P.M. until 1:42 P.M., at

which time the proceedings were resumed as follows:)"

Then, during the cross-examination by the State, this occurred:

"Q  All right.  What was the value of the equipment new?

"A  I don't know, sir.

"Q  You didn't consult anybody?  You don't know?

"A  Yes, sir.  We did, but I can't tell you offhand—I don't have those records.

"MR. LANDRUM: If it please the court, I again move for a mistrial at this time.

  *  *  *  *  *  *

"THE COURT: I will exclude the answer.

"MR. LANDRUM: Then we respectfully request the Court to again instruct the jury that the answer was improper, and this witness knows it is improper.

"THE COURT: Well, I don't know what the gentleman meant by using the term we.  I have explained already twice, I believe.  I—I will probably touch on it again in my final charge to the jury, but I have explained and re-explained.  I am now called up to re-explain once again what we are doing.

"I don't know what he meant by that. We don't try what happened in the Probate Court.  Either side can appeal to this Court, and the law says—and I swore I would follow the law, and, of course, you did, too—I. don't know whether you remember it or not, but you did.  We all swore.  You did at the beginning of the week, that you would try these cases in accordance with the law and the facts.  And I don't know whether you even knew that, but when I took term as—took office, that's what I swore I would do, and each time I take office as the judge, I swear the same thing, and we are all bound by it, and an honorable person will not violate his oath, and I am trying to do that, and I am sure you are.

"And I have explained to you already that what we are trying here is what is this—what are these proper figures on the basis of the facts as they're brought before you, not before somebody else.

"Now, he used the word we there.  I don't know exactly what he means by that. That is the reason I have excluded it.

"THE WITNESS: Judge, could I make a statement pertaining to—

"THE COURT: I don't know.  You have said some things that to be frank with you, apparently are—

"THE WITNESS: Maybe it's an explanation.

"THE COURT: That has brought us into trouble, as I see it, because I don't believe I am going to violate my oath.  I don't believe the jury will, but at the same time, I am supposed to carry on the case here in accordance with the law.

"THE WITNESS: It is more or less explanation.

"MR. LANDRUM: We object to voluntary statements.  We want to ask for a mistrial if this witness continues that conduct.

"THE COURT: But I would overrule the motion."

After studying this portion of the transcript, we do not consider the remarks of the trial judge prejudicial to the testimony of the witness before the jury.  It is clear to us that the trial judge was endeavoring to prevent the jury from being influenced by what he deemed to be an illegal inference from the testimony.  To prevent a miscarriage of justice, it is always the duty of a trial judge to so conduct the trial as to see that extraneous influences do not find their way into the jury box.  It has been often said:

"  *  *  *  One of the highest functions of our courts, organized as they are for the fair and impartial administration of justice, is 'to prevent, as far as possible, all improper, extraneous in-

fluences from finding their way into the jury box.' Metropolitan Life Ins. Co. v. Carter [212 Ala. 212, 102 So. 130], supra." F. W. Woolworth Co. v. Erickson, 221 Ala. 5, 9, 127 So. 534, 537. See also Wolffe v. Minnis, 74 Ala. 386; Chrysler Corp. v. Hassell, 291 Ala. 267, 280 So.2d 102.

This aim on the part of the trial judge appears to us to have motivated him to make his statements and explanations to the witness and to the jury. There is nothing that indicates to us that his remarks were unnecessary or that they were prejudicial to either the witness' testimony or to the appellants' cause. The judge's remarks may have been lengthy, if so, we consider such was necessary in order to explain to and impress on the witness his fault, which, after admonition, he continued rather than stopped.

We conclude that the trial court made no prejudicial comment upon the weight of the testimony given by the witness which is prohibited by Code of Ala., Tit. 7, § 270. The remarks of the court were made in the interest of a fair trial de novo uninfluenced by what the commissioners did in the probate court.

In considering this matter, we also point out the following:

"Considerable latitude of discretion is accorded to the nisi prius court in the conduct and regulation of trials. * * *" Taylor v. Thompson, 271 Ala. 18, 21, 122 So.2d 277, 279. See also State v. 2147 Pounds of Packing Stock Butter, 29 Ala.App. 607, 199 So. 739.

We are not willing to hold, in the light of what transpired, that the trial judge abused that discretion by his remarks and explanations in this case.

Moreover, the record discloses that the judge's remarks went completely unchallenged by the appellants when they were made. In fact, the appellants' counsel undertook at the outset, when the witness testified in terms of "we," to correct and explain to him his inaccuracy of statement.

As we stated in Colburn v. Mid-State Homes, Inc., 289 Ala. 255, 262, 266 So.2d 781, 865:

"Further, it does not appear that this objection was raised in the court below. The trial court will not be put in error unless the matter complained about was called to its attention by objection or by other appropriate method. State v. Boyd, 271 Ala. 584, 126 So.2d 225; Rice v. Hill, 278 Ala. 342, 178 So.2d 168; Thompson v. Havard, 285 Ala. 718, 235 So.2d 853."

This rule has oftentimes been repeated. See Dendy v. Eagle Motor Lines, 292 Ala. 99, 289 So.2d 603; Meriwether v. Crown Investment Corp., 289 Ala. 504, 510, 268 So. 2d 780; Morris v. Yancey, 267 Ala. 657, 663, 104 So.2d 553; Page v. Hawk, 250 Ala. 26, 28, 33 So.2d 8; Lane v. Lee, 50 Ala.App. 75, 78, 277 So.2d 352.

The appellants' motion for a new trial on similar grounds that the judge's remarks were erroneous and prejudicial did not cure the omission of timely reserving an exception. Such procedure is regarded as wholly ineffectual, because a motion for a new trial cannot take the place of an exception, which could and should be properly reserved during the trial. Geter v. Central Coal Co., 149 Ala. 578, 43 So. 367; Tucker v. Tucker, 248 Ala. 602, 611, 28 So.2d 637.

The only other question presented has to do with the application of the "Relocation Assistance Act," see Acts of Alabama, Special and Regular Sessions 1969, Special Session 1970, Volume 1, page 437, Code of Ala., Tit. 23, § 78(49) et seq. Pursuant to this Act, the trial judge stated to the jury that he had been informed that the State of Alabama had paid two brothers and two sisters, who were tenants of the building and carrying on the business

there, $5000 as they contemplated going out of business, rather than moving, that the payment was made in lieu of moving, and for that purpose only.

While the appellants agree that these facts were true, they contend that in stating the matter to the jury, the court erred, because the Relocation Assistance Act does not contemplate revealing to the jury any payment for removal, except to the property owner.

We do not consider such interpretation by the appellant a proper construction of the Act. Section 7, subd. C of the Act provides:

"* * * [A]ny amounts paid * * * to the property owner under this Act shall be made known to the court along with the basis of such payment, and such amounts and the items for which payments were made under this Act, shall not be considered as a part of just compensation, but shall be an additive payment to the displaced property owner. In those condemnation cases where damages are to be assessed, the court shall instruct * * * the jury as to the amount of any such payment * * * and the items for which such payments were made * * * and that such payments are considered as additives to the displaced property owner and that such payments are not to be considered as a part of just compensation."

The appellants argue that the court should not have told the jury about the payment of the $5000, because it was made to tenants who occupied the premises, rather than to property owners. We find no merit in this argument. The Act specifically provides in Section 2 as follows:

"When used in the Sections of this Act, the following words and phrases shall have the following meanings:

*       *       *       *       *       *

" 'Owner' shall mean an individual (or individuals: ) (a) owning, legally or eq-

uitably, * * * a * * * proprietary leasehold interest in the property * * *"

'In view of the broad definition given the word "owner," by the Act itself, lessees who are compelled to vacate their leasehold by reason of the taking, are "owners" within the terms and purposes of the Act.

There was no error in the court's instructing the jury about the payment made to the tenants of the property.

The judgment of the trial court is affirmed.

Affirmed.

HEFLIN, C. J., and COLEMAN, BLOODWORTH and JONES, JJ., concur.